UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YASMEEN ELAGHA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 24 C 12066 |
| ) | |
| NORTHWESTERN UNIVERSITY, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Yasmeen Elagha brings this case against Defendants Northwestern University ("Northwestern"), Hari Osofsky, Susan Michelle Spies Roth, and George Langford alleging violations of Title VI of the Civil Rights Act ("Title VI"), 42 U.S.C. § 2000d *et seq.* Before the Court is Defendants' motion to dismiss Elagha's amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, Defendants' motion is granted in part and denied in part.

**BACKGROUND**

The following facts come from the amended complaint and are presumed true for purposes of this motion. All reasonable inferences are drawn in Elagha's favor.

Elagha is a Palestinian Muslim woman who wears a hijab. She graduated from Northwestern's Pritzker School of Law ("Law School") in May 2024 and is currently a licensed attorney practicing in Illinois. At all relevant times, Defendant Osofsky was

the Dean of the Law School, Defendant Roth was the Associate Dean and Dean of Students at the Law School, and Defendant Langford was the Associate Dean/Infrastructure Planning and Design at the Law School (collectively, the "Defendant Deans").

While a law student, Elagha was very active in Pro-Palestinian, anti-war causes and organizations on campus. On or about November 16, 2023, Elagha attended a protest. Several law students followed and recorded Elagha and the other students participating in the protest, even when asked to stop. During the protest, other members of the Northwestern community made threatening remarks about the protesters' status at the university and their future job prospects, saying things like "we know people high up in university" and "good luck getting jobs after this." Dkt. # 24, ¶ 16.

Following the protest, pictures and videos of the protestors were shared on social media, including one post by another law student that garnered significant attention and attracted racist and harmful comments. Elagha had her private scholarship status exposed in a tweet by a fellow law student, though it was later deleted.

After the protest, a group of students, including Elagha, met with unknown Northwestern administrators to express their safety concerns and asked the school to issue a statement to promote civility on campus and to hold students accountable for doxing[1] and harassment. Despite assurances that Northwestern would follow up on the

---

[1] "Doxing," or "doxxing," "involves releasing someone's personal details onto the Internet in an easily accessible form . . . [and] [i]t may be used to humiliate, intimidate, threaten, or punish the identified individual." *Lord v. Smith*, 2022 WL 17668707, at *4 n.4 (N.D. Ill. 2022) (citing David

2

students' concerns, no concrete actions were taken to address the threats or the doxing incidents.

Since at least November 2022, Elagha made complaints in writing to Northwestern regarding the harassment and targeting she faced by other students, but Elagha did not receive any protections like other students of different racial and ethnic backgrounds had received. In November 2022, Elagha filed a report with Northwestern's Office of Civil Rights ("OCR") against fellow law student Anita Kinney after Kinney publicly stated that she was "personally gunning for" Elagha after she sent a school-wide email supporting Palestine. Elagha asked Northwestern to issue a no-contact directive against Kinney as it customarily would have done when requested by students of other races. Northwestern ignored Elagha's request.

Since at least 2023 and 2024, Elagha made numerous complaints and warnings in writing to Northwestern that other students' harassment and targeting put her at risk of losing career opportunities.

On or about November 16, 2023[2], Elagha again participated in a silent protest held on Northwestern's campus. At this time, Elagha had recently received a job offer

---

M. Douglas, *Doxing: A Conceptual Analysis*, 18 ETHICS INFO. TECH. 199, 199 (2016)); *see also Dye v. City of Bloomington*, 580 F. Supp. 3d 560 (S.D. Ind. 2022) ("'Doxing' refers to publicly identifying someone or publishing private information about someone as a form of punishment or revenge.").

[2] This is the same date as the protest discussed above. *See* Dkt. # 24, ¶ 13 ("On or about November 16, 2023, Palestinian students and anti-war allies, including Plaintiff Elagha, held a silent protest . . . ."). The amended complaint later alleges, "On or about November 16, 2023, Plaintiff Elagha *again* participated in a silent protest held on Defendant Northwestern's campus."

from the internationally recognized law firm DLA Piper as an associate in their Fall 2024 class. After the protest, fellow law student Melody Mostow falsely reported to the Northwestern University Police Department ("NUPD") that Elagha assaulted, battered, and harassed her at the protest. NUPD did not contact Elagha and instead posted Mostow's allegations on their website. NUPD failed to remove the false claim from their public database.

After the November 2023 protest, Elagha again filed an OCR report against Kinney, whom she believes encouraged Mostow to make the false report. She asked Northwestern to issue a no-contact directive against Kinney because Kinney began "doxing" Elagha. Northwestern treated Elagha's request differently than other similarly situated students of different ethnic and racial backgrounds and denied Elagha's request.

On or about May 20, 2024, Tony Kinnett, an investigative columnist with the Daily Signal emailed Elagha stating that she "is alleged to have followed/stalked and then assaulted an individual on November 9, 2023" and asked her "Did you follow/stalk Melody Mostow on 11/9/23? Did you assault Melody Mostow on 11/9/23?" Dkt. # 24, ¶ 35. Elagha forwarded the reporter's email to the Defendant Deans with the notice that "Now, I am at risk of being defamed with false allegations from Melody Mostow. I can consider my job offer rescinded if this publishes. I need the administration's assistance

---

*Id.* ¶ 25 (emphasis added). It is unclear whether there were two different protests or one of these dates is merely a scrivener's error.

in immediately shutting this down. The administration must contact the reporter and emphasize that this event is fully fabricated, false, and defamatory." *Id.* ¶ 36. Roth responded on behalf of Northwestern and advised Elagha to refer the reporter to media@northwestern.edu, the official email for requests for comments from Northwestern. Kinnett was provided with the email address.

On or about May 21, 2024, the Daily Signal published an article that Elagha "berated a fellow law student, Melody Mostow for taking photographs of the demonstration" and that "in public comments, Melody Mostow alleged that Yasmeen Elagha pushed her in the back. She filed a police report with Northwestern University Police about the incident involving Elagha." *Id.* ¶ 42. Kinnett also made posts on his social media account regarding the same.

On or about May 22, 2024, the Connecticut Star and the Tennessee Star published an article that Elagha "berated a fellow law student, Melody Mostow for taking photographs of the demonstration" and that "in public comments, Melody Mostow alleged that Yasmeen Elagha pushed her in the back. She filed a police report with Northwestern University Police about the incident involving Elagha." *Id.* ¶ 43. Upon information and belief, neither Star Media, the Daily Signal, the Connecticut Star, the Tennessee Star, nor Kinnett ever reached out to Northwestern to corroborate the allegations.

On or about May 22, 2024, Elagha received an email from DLA Piper asking her to complete paperwork for a background check. Elagha immediately emailed the

5

Defendant Deans the published articles, informed them of DLA Piper's request, and expressed her disappointment that Northwestern failed to protect her. On or about May 23, 2024, Dean Roth responded to Elagha that the reporter did not choose to contact the university.

Northwestern's OCR investigated Mostow's report against Elagha and found that there was no physical contact between the two students. The OCR "reviewed video footage of the demonstration and did not observe any physical contact between Ms. Elagha and Student A [Mostow]. Based on the above, NU-OCR found no violation of University policy." Dkt. # 24, ¶ 50. On information and belief, Mostow recanted her allegations against Elagha only to Dean Roth.

While studying for the bar exam, on or about June 3, 2024, the Illinois Board of Law Admissions ("Board") sent Elagha a letter requesting additional information to complete processing of her Character and Fitness application due to receiving information that (1) she is a party in a civil suit, and (2) she was "involved in a protest at NU which possibly resulted in a criminal charge." Elagha forwarded the Board's letter to Northwestern and the Defendant Deans on or about June 17, 2024. It took Northwestern at least two weeks to respond to Elagha and at least another week to send a letter to the Board confirming that the allegations against Elagha regarding criminal charges was false and no findings of responsibility were issued from any Title IX complaint.

On or about July 10, 2024, DLA Piper terminated Elagha's employment. On or about August 7, 2024, DLA Piper confirmed their termination of Elagha and did not change their position.

As a result of the foregoing, Elagha filed suit against Northwestern and the Defendant Deans. Her amended complaint brings claims under Title VI for intentional discrimination, hostile environment, and deliberate indifference.[3] Defendants move to dismiss the amended complaint in its entirety for failure to state a claim.

## **LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529 (2011). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

---

[3] Elagha also brought state law breach of contract claims but has since voluntarily dismissed those claims. *See* Dkt. # 30.

7

**DISCUSSION**

Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Court construes the amended complaint as having two components: an intentional discrimination claim, and a hostile educational environment claim.

### I.    Intentional Discrimination

To state an intentional discrimination claim under Title VI, Elagha must allege facts satisfying two elements: (1) that she was intentionally discriminated against on the grounds of race; and (2) that Northwestern is a recipient of federal financial assistance. *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). Threadbare allegations and/or conclusory statements are not sufficient to survive a motion to dismiss. *Id.* Defendants do not dispute that Northwestern is a recipient of federal financial assistance. Thus, the question is whether Elagha's amended complaint contains sufficient allegations to plausibly state a claim for intentional discrimination.

A plaintiff can show intentional discrimination directly or indirectly. *Totten v. Benedictine Univ.*, 2021 WL 3290926, at *9 (N.D. Ill. 2021). To demonstrate discrimination under the direct method, Elagha must provide "direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial discrimination . . . ." *Lubavitch-Chabad of Ill., Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806,

8

816 (N.D. Ill. 2013), *aff'd*, 772 F.3d 443 (7th Cir. 2014) (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010)). "Direct evidence typically relates to the motivation of the decisionmaker responsible for the contested decision." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (quotation marks omitted). To demonstrate discrimination under the indirect method, Elagha must show she (1) is a member of a protected class, (2) met the school's legitimate expectations, (3) suffered an adverse action, and (4) was treated less favorably than similarly situated individuals outside of her protected class. *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).

Elagha argues she adequately pleaded discrimination under the direct method based on her allegations that despite filing numerous written complaints regarding the harassment she experienced, she "did not receive any protections like other students of different racial and ethnic backgrounds had received." Dkt. # 31, at 6 (citing Dkt. # 24, ¶¶ 21–24. While Elagha does not allege any blatant discriminatory behavior by Defendants, the allegations that Elagha made multiple complaints regarding the harassment and Defendants failed to respond to any of those complaints—or at least responded differently to her complaints than it had to similar claims by students outside of Elagha's protected class—at this stage, permit an inference of intentional discrimination. *See Anthony v. O'Fallon Twp. High. Sch. Dist. 203 Bd. of Educ.*, 712 F. Supp. 3d 1109, 1119 (S.D. Ill. 2024) ("Here, Anthony's pleading stating that Dollison made a disparaging remark to Zariah and other students and that OTHS apparently

9

wholly failed to investigate the matter when it was elevated to the principal and superintendent by Anthony and the parents of the other students produces an inference of discriminatory intent, thus meeting the first element of the Title VI discrimination claim."). Defendants' motion to dismiss is denied with respect to Elagha's intentional discrimination Title VI claim.

## II. Hostile Educational Environment

To establish a hostile educational environment claim under Title VI, Elagha must show that: (1) she participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived her of access to educational benefits; (3) the school had actual knowledge of the conduct; and (4) the school was deliberately indifferent toward the conduct.[4] *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014).

Defendants first argue Elagha's allegations of harassment do not satisfy the "severe and pervasive" element of her claim. The Court agrees. "In the education context, courts have required consistent and/or severe misconduct, such as physical threats, the use of racial epithets, violence, or sexual contact and abuse at school to establish a hostile environment claim." *Ervins v. Sun Prairie Area Sch. Dist.*, 609 F. Supp. 3d 709, 722 (W.D. Wis. 2022); *see also*, *e.g.*, *Doe I v. Bd. of Educ. of City of*

---

[4] The Seventh Circuit has said that "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *see also Students & Parents for Privacy v. Sch. Dirs. of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 900 (N.D. Ill. 2019) ("Basically, Title VI is to race, color and national origin what Title IX is to sex.") (citing *Galster*, 768 F.3d at 617).

*Chi.*, 364 F. Supp. 3d 849, 860 (N.D. Ill. 2019) (school employee who made sexually explicit comments to students, walked into locker room while students were changing, sexually touched students, slapped them, and committed battery against students created a hostile educational environment); *Qualls v. Cunningham*, 183 F. App'x 564, 567 (7th Cir. 2006) (threats, racial slurs, and unfounded attempts by campus police to detain the plaintiff would constitute a hostile educational environment); *C.S. v. Couch*, 843 F. Supp. 2d 894, 908 (N.D. Ind. 2011) (racial epithets, threats, throwing a student into a bathroom stall, and punching him in the face constituted hostile racial environment); *Galster*, 768 F.3d at 618 (student-on-student harassment involving multiple serious violent physical attacks created a hostile learning environment).

Here, Elagha principally alleges that, while at a protest, she was recorded or photographed without her consent, and community members made threatening remarks about the protestors' future career prospects. She had her scholarship status exposed in a social media post that was later deleted. Another law student told Elagha she was "personally gunning for" Elagha and "doxed" Elagha. A different student falsely reported to campus police that Elagha assaulted her at the November 2023 protest. These things, taken cumulatively, are troubling, but cannot be characterized as rising to the level of "severe, pervasive, and objectively offensive." Elagha does allege that she made numerous written complaints detailing the harassment she endured, but the amended complaint lacks sufficient details for the Court to determine whether there were additional incidents beyond those set forth in the amended complaint.

Nor does Elagha adequately allege that she was deprived of educational benefits while the harassment was ongoing. "Examples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 823 (7th Cir. 2003) (internal citations omitted). Here, Elagha alleges she lost a career opportunity. However, she graduated with honors and is currently a licensed, practicing attorney. *See*, *e.g.*, *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (student-to-student sexual harassment did not deprive plaintiff of access to education when "her grades did not suffer, she was not extensively absent from school, she graduated with a class rank of 27 out of over 500, and thereafter enrolled in college"); *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 685 (7th Cir. 2004) (professor's obsessive behavior toward student, singling her out for attention, sending notes, flowers, stalking her, and lurking outside her apartment did not deprive student of access to education because she received an A in the class and her academic performance was unaffected).

Even accepting the amended complaint's allegations as sufficient to show severe and pervasive harassment, the claim falters on the deliberate indifference element. An institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the circumstances it actually knows about, to any incidents of "severe, pervasive, and objectively offensive" conduct. *See Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 809 (7th Cir. 2021). This standard "requires that the

12

school's response not be *clearly* unreasonable, which is a higher standard than reasonableness." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 607 (N.D. Ill. 2021) (emphasis added). A school's response will "suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022).

A response need not be perfect or even successful to clear this bar. *Id.* A "negligent response," for example, "is not unreasonable, and therefore will not subject a school to [Title VI] liability." *Moore*, 570 F. Supp 3d at 607. Nor do victims have license to demand specific remedial actions from the school. *Id.*; *see also Galster*, 768 F.3d at 621 (noting that plaintiffs are not "entitle[d] . . . to any specific remedial measure" (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012)). Depending on the circumstances, even a decision not to impose any remedial measures at all is not necessarily clearly unreasonable or deliberately indifferent. *Id.*; *see also Jauquet*, 996 F.3d at 809; *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023) ("[A] claim that an institution could or should have done more does not establish deliberate indifference."). In short, Elagha's dissatisfaction with Defendants' response (or lack thereof) to her complaints does not mean Defendants were deliberately indifferent. And, as for Elagha's complaints regarding Defendants' "lack of expediency" in sending a letter to DLA Piper refuting the allegations against Elagha, the Court cannot conclude that a two-week response time is objectively unreasonable

or illustrates deliberate indifference. Deliberate indifference is a "stringent standard of fault," *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997), and Elagha's amended complaint does not clear this high bar. Defendants' motion to dismiss is granted with respect to Elagha's hostile environment and deliberate indifference claims. Those claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [27] is granted in part and denied in part. The motion is denied as to Count I and granted as to Count II. Elagha may file an amended complaint by 6/3/2025. A telephonic status hearing is set for 7/1/2025 at 9:50 a.m. For the telephonic status hearing, parties are to use the following call-in number: 1-650-479-3207, access code 2300 000 6287 or with the following link https://us-courts.webex.com/meet/Judge_Kocorasilnd.uscourts.gov. When using the link, Counsel must type in their name when joining the call. Throughout the call, each speaker will be expected to identify themselves for the record before speaking.

It is so ordered.

Charles P. Kocoras
United States District Judge

Dated: 5/13/2025