UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| YASMEEN ELAGHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 24 C 12066 |
| | ) | |
| NORTHWESTERN UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Yasmeen Elagha brings this case against Defendants Northwestern University ("Northwestern") and Hari Osofsky, Susan Michelle Spies Roth, and George Langford (together, the "Defendant Deans") alleging violations of Title VI of the Civil Rights Act ("Title VI"), 42 U.S.C. § 2000d *et seq.* Before the Court is Defendants' motion to dismiss Elagha's second amended complaint ("SAC") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, Defendants' motion is granted.

## BACKGROUND

The following facts come from the SAC and are presumed true for purposes of this motion. All reasonable inferences are drawn in Elagha's favor.

Elagha is a Palestinian Muslim woman who wears a hijab. She graduated from Northwestern's Pritzker School of Law ("Law School") in May 2024 and is currently a

licensed attorney practicing in Illinois. At all relevant times, Defendant Osofsky was the Dean of the Law School, Defendant Roth was the Associate Dean and Dean of Students at the Law School, and Defendant Langford was the Associate Dean/Infrastructure Planning and Design at the Law School.

While a law student, Elagha was very active in Pro-Palestinian, anti-war causes and organizations on campus. Since at least November 2022, Elagha made complaints in writing to Northwestern regarding harassment and targeting she faced from other students, but Elagha did not receive any protections like other students of different racial and ethnic backgrounds had received. For example, in November 2022, Elagha filed a report with Northwestern's Office of Civil Rights ("OCR") against fellow law student, "A.K.", after A.K. publicly stated that she was "personally gunning for" Elagha after she sent a school-wide email supporting Palestine. Elagha asked Northwestern to issue a no-contact directive against A.K. as it customarily would have done when requested by students of other races. Northwestern ignored Elagha's request.

At some point after October 2023, "a fellow student, [S.M.], published violent social media posts against Palestinians and pro-Palestinian supporters, including threats to 'share your address online' if one supports Hamas." Dkt. # 38, ¶ 64. Elagha reported these threats and safety concerns to Northwestern administrators, but no action was taken, and her complaints were not followed up with or taken seriously. Despite Plaintiff's safety complaints, Northwestern did not discipline S.M.

In November 2023, Elagha attended a protest. Several law students followed and recorded Elagha and the other students participating in the protest, even when asked to stop. During the protest, other members of the Northwestern community made threatening remarks about the protesters' status at the university and their future job prospects, saying things like "we know people high up in university" and "good luck getting jobs after this." Dkt. # 38, ¶ 16. Pictures and videos of the protestors were shared on social media, including one post by another law student that garnered significant attention and attracted racist and harmful comments. Elagha had her private scholarship status exposed in a tweet by a fellow law student, though it was later deleted.

A fellow law student, "M.M.", falsely reported to the Northwestern University Police Department ("NUPD") that Elagha assaulted, battered, and harassed her at the November 2023 protest. NUPD did not contact Elagha and instead posted M.M.'s allegations on their website. NUPD failed to remove the false claim from their public database.

Elagha again filed an OCR report against A.K., whom she believes encouraged M.M. to make the false report. She asked Northwestern to issue a no-contact directive against A.K. because A.K. began "doxing"[1] Elagha. Northwestern treated Elagha's

---

[1] "Doxing," or "doxxing," "involves releasing someone's personal details onto the Internet in an easily accessible form . . . [and] [i]t may be used to humiliate, intimidate, threaten, or punish the identified individual." *Lord v. Smith*, 2022 WL 17668707, at *4 n.4 (N.D. Ill. 2022) (citing David M. Douglas, *Doxing: A Conceptual Analysis*, 18 ETHICS INFO. TECH. 199, 199 (2016)); *see also Dye v. City of Bloomington*, 580 F. Supp. 3d 560, 565 n.1 (S.D. Ind. 2022) ("'Doxing' refers

3

request differently than other similarly situated students of different ethnic and racial backgrounds and denied Elagha's request.

After the November 2023 protest, a group of students, including Elagha, met with unknown Northwestern administrators to express their safety concerns and asked the school to issue a statement to promote civility on campus and to hold students accountable for doxing and harassment. Despite assurances that Northwestern would follow up on the students' concerns, no concrete actions were taken to address the threats or the doxing incidents.

Because of the "hostile and unsafe learning environment and the personal losses she endured," Elagha did not feel safe on campus during the Fall 2023 semester. Dkt. # 38, ¶ 67. Northwestern excused her from classes but did not grant Elagha a remote learning accommodation. Because she could not attend her classes, Elagha did not feel adequately prepared to take her final exams for the Fall 2023 semester. The exams were deferred to the Spring 2024 semester, "during which she was forced to independently teach herself an entire year's worth of coursework and complete all exams within a two-week period shortly before graduating in May 2024." Dkt. # 38, ¶ 71.

In February 2024, Elagha complained to Defendant Deans Osofsky and Spies Roth that one of Elagha's professors told her that "someone who looks like you probably shouldn't go around saying they're going to blow things up." Dkt. # 38, ¶ 74.

---

to publicly identifying someone or publishing private information about someone as a form of punishment or revenge.").

This remark was in response to Elagha indicating that she would blow something up on her computer screen, meaning enlarge the object for easier viewing.

On or about May 20, 2024, Tony Kinnett, an investigative columnist with the Daily Signal emailed Elagha stating that she "is alleged to have followed/stalked and then assaulted an individual on November 9, 2023" and asked her "Did you follow/stalk [M.M.] on 11/9/23? Did you assault [M.M.] on 11/9/23?" Dkt. # 38, ¶ 35. Elagha forwarded the reporter's email to the Defendant Deans with the notice that "Now, I am at risk of being defamed with false allegations from [M.M.]. I can consider my job offer rescinded if this publishes. I need the administration's assistance in immediately shutting this down. The administration must contact the reporter and emphasize that this event is fully fabricated, false, and defamatory."[2] *Id.* ¶ 36. Dean Roth responded and advised Elagha to refer the reporter to media@northwestern.edu, the official email for requests for comments from Northwestern.

On or about May 21, 2024, the Daily Signal published an article that Elagha "berated a fellow law student, [M.M.] for taking photographs of the demonstration" and that "in public comments, [M.M.] alleged that Yasmeen Elagha pushed her in the back. She filed a police report with Northwestern University Police about the incident involving Elagha." *Id.* ¶ 42. Kinnett also made posts on his social media account regarding the same.

---

[2] In the Fall 2023 semester, Elagha received a job offer from the internationally recognized law firm DLA Piper as an associate in their Fall 2024 class

5

On or about May 22, 2024, the Connecticut Star and the Tennessee Star published an article that Elagha "berated a fellow law student, [M.M.] for taking photographs of the demonstration" and that "in public comments, [M.M.] alleged that Yasmeen Elagha pushed her in the back. She filed a police report with Northwestern University Police about the incident involving Elagha." *Id.* ¶ 43. Upon information and belief, neither Star Media, the Daily Signal, the Connecticut Star, the Tennessee Star, nor Kinnett ever reached out to Northwestern to corroborate the allegations.

Northwestern's OCR investigated M.M.'s report against Elagha and found that there was no physical contact between the two students. The OCR "reviewed video footage of the demonstration and did not observe any physical contact between Ms. Elagha and Student [ ] [M.M.]. Based on the above, NU-OCR found no violation of University policy." Dkt. # 38, ¶ 50. On information and belief, M.M. recanted her allegations against Elagha only to Dean Roth.

On or about May 22, 2024, Elagha received an email from DLA Piper asking her to complete paperwork for a background check. Elagha immediately emailed the Defendant Deans the published articles, informed them of DLA Piper's request, and expressed her disappointment that Northwestern failed to protect her. Dean Roth responded to Elagha the next day and informed her that the reporter did not choose to contact the university.

While studying for the bar exam, on or about June 3, 2024, the Illinois Board of Law Admissions ("Board") sent Elagha a letter requesting additional information to

6

complete processing of her Character and Fitness application due to receiving information that (1) she is a party in a civil suit, and (2) she was "involved in a protest at NU which possibly resulted in a criminal charge." Dkt. # 38, ¶ 53. Elagha forwarded the Board's letter to Northwestern and the Defendant Deans on or about June 17, 2024. It took Northwestern at least two weeks to respond to Elagha and at least another week to send a letter to the Board confirming that the allegations against Elagha regarding criminal charges were false and no findings of responsibility were issued from any Title IX complaint.

On or about July 10, 2024, DLA Piper terminated Elagha's employment. On or about August 7, 2024, DLA Piper confirmed their termination of Elagha and did not change their position.

As a result of the foregoing, Elagha filed suit against Northwestern and the Defendant Deans. Her SAC brings claims under Title VI for intentional discrimination and hostile educational environment. Although the Court previously denied Defendants' motion to dismiss the intentional discrimination claim, Defendants nevertheless now move to dismiss the SAC in its entirety for failure to state a claim.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's

7

basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a motion to dismiss for failure to state a claim, the Court accepts as true the well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). Legal conclusions, however, are not entitled to such treatment. *See Twombly*, 550 U.S. at 555.

## DISCUSSION

### I. The Individual Defendants

As an initial matter, the Court grants Defendants' motion to dismiss as to the claims against the Defendant Deans. Neither the United States Supreme Court nor the Seventh Circuit has squarely addressed the issue of individual liability under Title VI. However, the Seventh Circuit has said that "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). And "Title IX claim[s] can only be brought against a grant recipient and not an individual." *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019 (7th Cir. 1997). The allegations in the second amended complaint do not show that any of the Defendant Deans are recipients of federal funds, and an individual does not become a recipient of federal funds merely because that individual is employed by the defendant. *Rogers v. Office of the AG*, 2017 WL 2864950, at *2 (N.D. Ind. 2017). Elagha offers no argument to the contrary. The Title VI claims against the Defendant Deans are dismissed, with prejudice.

## II. Hostile Educational Environment

To establish a hostile educational environment claim under Title VI, Elagha must show that: (1) she participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived her of access to educational benefits; (3) the school had actual knowledge of the conduct; and (4) the school was deliberately indifferent toward the conduct.[3] *Galster*, 768 F.3d at 617.

Defendants argue that while Elagha contends she made complaints to Northwestern regarding "harassment and targeting" by other students, she does not describe what the harassment was, where it took place, or its frequency. Defendants are correct that generalized complaints of harassment are insufficient, and more details regarding the specific complaints she made to Northwestern would be preferable. Elagha, however, "need not provide details of the time, place, offender, and precise statement for every incident." *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1312 (10th Cir. 2020), and the SAC details multiple instances of harassment complaints to specific Northwestern offices or administrators. A fellow student published violent and threatening social media posts against Palestinians and pro-

---

[3] Again, "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other," and therefore Court cites to both Title VI and IX case law. *Galster*, 768 F.3d at 617; *see also Students & Parents for Privacy v. Sch. Dirs. of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 900 (N.D. Ill. 2019) ("Basically, Title VI is to race, color and national origin what Title IX is to sex.") (citing *Galster*, 768 F.3d at 617; *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.").

Palestinian supporters. Elagha made two OCR complaints against a fellow student for threatening behavior.

While at a protest, Elagha was recorded or photographed without her consent, and community members made threatening remarks about the protestors' future career prospects. She had her scholarship status exposed in a social media post that was later deleted. Another law student told Elagha she was "personally gunning for" Elagha and "doxed" Elagha. A different student falsely reported to campus police that Elagha assaulted her at the November 2023 protest. In evaluating the sufficiency of these same allegations in Elagha's amended complaint, the Court found that "[t]hese things, taken cumulatively, are troubling, but cannot be characterized as rising to the level of 'severe, pervasive, and objectively offensive.'" Dkt. # 36, at 11. The SAC, however, contains additional allegations that shed more light on the severity of the harassment.

As part of the inquiry into the severity of the harassment, the Court considers whether the alleged harassment had a negative impact on Elagha's access to education. It is frequently repeated that "[e]xamples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 823 (7th Cir. 2003) (internal citations omitted). In arguing the SAC fails to meet this standard, Defendants focus on the absence of any allegations in the SAC that Elagha's academic performance suffered and this Court's previous observation that Elagha "graduated with honors and is currently a licensed, practicing attorney." Dkt. # 36, at

10

12. However, while Elagha's grades might not have suffered, that does not mean the harassment she claims to have endured did not have a "concrete, negative effect" on Elagha's access to education. *Gabrielle M.*, 315 F.3d at 821 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654 (1999)). Elagha alleges she felt unsafe attending classes, so much so that her attendance was excused by the school. However, because no accommodation was provided which would allow her to attend classes remotely, Elagha was deprived of valuable in-person classroom instruction. She was forced to defer her exams until the next semester, "during which she was forced to independently teach herself an entire year's worth of coursework and complete all exams within a two-week period shortly before graduating in May 2024." Dkt. # 38, ¶¶ 70–71. True, Elagha graduated with honors. But as the Tenth Circuit has aptly suggested, maintaining good grades in the face of harassment is not dispositive:

> We are somewhat surprised that the District so devalues classroom instruction and experience that it argues that their denial is not a denial of access to education. Yes, Ms. Doe maintained a 4.0 average. Apparently, she is quite bright. Does that mean that she would have derived no benefit from the instruction provided by her teachers? And there is certainly a body of thought that the socialization from attending school with peers is an important, perhaps essential, advantage of the school experience.

*Sch. Dist. No. 1*, 970 F.3d at 1312–13. At the dismissal stage, Elagha's allegations plausibly amount to a deprivation of educational benefits.

Defendants next argue that Elagha's vague allegations of "numerous complaints and warnings in writing," Dkt. # 38, ¶ 24, about the harassment do not establish actual knowledge on the part of Northwestern. However, given that Elagha filed at least two

11

OCR complaints and Northwestern excused Elagha's absence from classes and allowed her to defer her exams, the SAC plausibly establishes actual knowledge of at least some of the harassing conduct.

The final element of a hostile educational environment claim is establishing deliberate indifference on the part of the school. This is where Elagha's claim falls short. An institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the circumstances it actually knows about, to any incidents of "severe, pervasive, and objectively offensive" conduct. *See Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 809 (7th Cir. 2021). This standard "requires that the school's response not be *clearly* unreasonable, which is a higher standard than reasonableness." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 607 (N.D. Ill. 2021) (emphasis added). A school's response will "suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022). A response need not be perfect or even successful to clear this bar. *Id.* "In short, the question is not whether the school's response satisfied the plaintiff; rather, the question is whether the school responded in a way that was clearly unreasonable." *Canel v. Art Inst. of Chi.*, 2025 WL 564504, at *6 (N.D. Ill. 2025).

As to deliberate indifference, Elagha argues that Northwestern "unreasonably failed to act to protect" Elagha, and "[w]here it did act, it acted grossly inadequately

and discriminatorily." Dkt. # 46, at 9. Importantly, though, Elagha does not have "license to demand specific remedial actions from the school." *Jauquet*, 996 F.3d at 809; *see also Galster*, 768 F.3d at 621 (plaintiffs are not "entitle[d] . . . to any specific remedial measure." (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012))); *Moore*, 570 F. Supp. 3d at 607 (Title VI "does not require schools to remedy the misconduct as the victims would see fit."). While Elagha may have preferred a different course of action from Northwestern, she cannot contend that her complaints fell on deaf ears. Northwestern excused Elagha's absences from class, deferred her exams, and sent letters to DLA Piper and the Illinois Bar at her request. Elagha's "claim that [Northwestern] could or should have done more does not establish deliberate indifference." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023); *see also S.Q. v. Kettle Moraine Sch. Dist.*, 2022 WL 2275177, at *9 (E.D. Wis. 2022) ("A school district is not deliberately indifferent simply because it did not follow its own policies, could have handled the situation better, or did not handle the matter in the way the plaintiff wanted.") (internal citations omitted).

Again, deliberate indifference is a "stringent standard of fault," *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997), and Elagha's SAC does not clear this high bar. The hostile educational environment claim is dismissed, without prejudice.

### III. Intentional Discrimination

Although the Court allowed Elagha's intentional discrimination claim to proceed when ruling on Defendants' motion to dismiss her amended complaint, Defendants urge

13

the Court to reconsider that ruling here. The Court agrees that the intentional discrimination claim warrants a second look.

To state an intentional discrimination claim under Title VI, Elagha must allege facts satisfying two elements: (1) that she was intentionally discriminated against on the grounds of race; and (2) that Northwestern is a recipient of federal financial assistance. *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). A plaintiff can show intentional discrimination directly or indirectly. *Totten v. Benedictine Univ.*, 2021 WL 3290926, at *9 (N.D. Ill. 2021). To demonstrate discrimination under the direct method, Elagha must provide "direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial discrimination." *Lubavitch-Chabad of Ill., Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806, 816 (N.D. Ill. 2013) (cleaned up) (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010), *aff'd*, 772 F.3d 443 (7th Cir. 2014)). "Direct evidence typically relates to the motivation of the decisionmaker responsible for the contested decision." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (cleaned up). To demonstrate discrimination under the indirect method, Elagha must show she (1) is a member of a protected class, (2) met the school's legitimate expectations, (3) suffered an adverse action, and (4) was treated less favorably than similarly situated individuals outside of her protected class. *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).

14

Elagha does not respond to Defendants' arguments in her response to the instant motion; instead, she simply incorporates her arguments from her response to Defendants' motion to dismiss her amended complaint. There, Elagha argued she adequately pleaded discrimination under the direct method based on her allegations that despite filing numerous written complaints regarding the harassment she experienced, she "did not receive any protections like other students of different racial and ethnic backgrounds had received." Dkt. # 31, at 6 (citing Dkt. # 24, ¶¶ 21–24). In evaluating the claim, the Court concluded that:

> While Elagha does not allege any blatant discriminatory behavior by Defendants, the allegations that Elagha made multiple complaints regarding the harassment and Defendants failed to respond to any of those complaints—or at least responded differently to her complaints than it had to similar claims by students outside of Elagha's protected class—at this stage, permit an inference of intentional discrimination.

Dkt. # 36, at 9 (citing *Anthony v. O'Fallon Twp. High. Sch. Dist. 203 Bd. of Educ.*, 712 F. Supp. 3d 1109, 1119 (S.D. Ill. 2024)).

However, Defendants have rightly pointed out that Elagha has not put forth a single example of a similarly situated individual outside her protected class that received the response Elagha sought from Northwestern when she complained of harassment. Without this kind of critical supporting factual allegation, Elagha's claims that she was treated differently because of her protected status ring hollow. Defendants' motion to dismiss the intentional discrimination claim is granted.

15

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss [41] is granted. The claims against Defendants Osofsky, Spies Roth, and Langford are dismissed with prejudice, and the claims against Defendant Northwestern are dismissed without prejudice. If Elagha believes in good faith she can remedy the defects identified above, the Court will permit Elagha to file a third amended complaint by 11/17/2025. A telephonic status hearing is set for 12/2/2025 at 10:10 a.m.

It is so ordered.

*Charles P. Kocoras*
Charles P. Kocoras
United States District Judge

Dated: 11/3/2025