## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

**YASMEEN ELAGHA**

       *Plaintiff*,

v.                               **Case No: 1:24-cv-12066**
                                          **Hon. Charles P. Kocoras**
                                        **JURY TRIAL DEMANDED**

**NORTHWESTERN UNIVERSITY**

       *Defendant.*

---

### THIRD-AMENDED COMPLAINT

    **NOW COMES**, Plaintiff, Yasmeen Elagha, by and through her counsel, Waleed Naser, and Farah Chalisa, and for her Third-Amended Complaint ("Amended Complaint"), states and alleges the following:

### NATURE OF PLAINTIFF'S CLAIMS

1. Plaintiff's claims are brought pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., 28 U.S.C. §§ 1331, 1337, 1343, and 1367; and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's claims pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

3. This Court has jurisdiction to render and issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*.

4. Venue is proper in the Eastern District of Illinois under 28 U.S.C. § 1391 because Plaintiff is a resident of the Eastern District of Illinois, and the actions giving rise to the claims pled and alleged in this amended Complaint all occurred within the Eastern District of Illinois.

## PARTIES

5. Plaintiff **YASMEEN ELAGHA** ("Plaintiff" or "Plaintiff Elagha" or "Elagha") is a Middle Eastern, Palestinian, Muslim woman from the Gaza Strip who wears a hijab and who graduated from Northwestern Law School in May 2024.

6. Defendant **NORTHWESTERN UNIVERSITY** ("Defendant") is a university located in the state of Illinois that receives financial assistance and funding from the United States federal government.

## FACTUAL ALLEGATIONS

7. In or around January 2021, Plaintiff Elagha was accepted into Defendant's law school.

8. Plaintiff attended Defendant's law school from August 2021 through May 2024, at which time she graduated with her law degree.

9. While a law student, Plaintiff Elagha was very active in pro-Palestine, anti-war causes and organizations on Defendant's campus.

10. During her time as a law student at Defendant, Plaintiff suffered discriminatory conduct by Defendant, including but not limited to Defendant's students, faculty, and staff, on the basis of her protected classes, including her race, national origin, and religion.'

11. During and before Plaintiff's time as a student at Defendant, Defendant hosted an "iTrek" trip to Israel every summer, which Plaintiff and other Palestinian students of Defendant were barred from participating in due to their Palestinian national origin.

12. A Palestinian student reported to Defendant that Palestinian students, including Plaintiff, could not participate in the iTrek trip due to their Palestinian national origin.

13. Defendant failed to take any corrective action or otherwise address the report.

14. Other, similarly-situated students outside of Plaintiff's protected classes were not subject to the same or similar treatment, including being prevented from undertaking the iTrek trip to Israel as Plaintiff was.

15. In or around November 2022, Plaintiff sent an email to Defendant's student body related to Palestine, which resulted in law student Anita Kinney stating she was "personally gunning for" Plaintiff.

16. Kinney subsequently subjected Plaintiff to an incessant barrage of unwanted and harassing communication and threatening conduct, including a plan to ambush Elagha at a public Student Bar Association (SBA) meeting Plaintiff expressed she would attend.

17. Plaintiff promptly reported Kinney's harassing and hostile conduct to Defendant, including Defendant's Office of Civil Rights ("OCR"), and requested a no-contact directive against Kinney, as Defendant customarily has done when requested by students of other races, to ensure Plaintiff's safety from Kinney's hostile and threatening conduct against her.

18. Shortly before the public SBA meeting Plaintiff expressed she would attend, she received a phone call from the Vice President of SBA instructing her not to attend the SBA meeting.

19. Kinney did not receive the same instruction not to attend the SBA meeting.

20. Plaintiff promptly reported the conduct of Kinney and the SBA Vice President to Defendant, including Defendant's OCR through a formal report, and reiterated her request for a no-contact directive against Kinney.

21. Defendant did not take any corrective action or any action otherwise in response to Plaintiff's report or request.

22. After repeated requests by Plaintiff, Defendant failed to grant Plaintiff a no-contact directive against Kinney.

23. Further, Defendant failed to communicate any resolution of Plaintiff's OCR report to Plaintiff.

24. Defendant granted at least one other student outside of Plaintiff's protected classes a no-contact directive against Kinney for similar conduct by Kinney against the student, while failing to grant Plaintiff the same.

25. On or about October 7, 2023, Israel began its attacks on the Gaza Strip, where Plaintiff originates, where Plaintiff's family lives, and where Plaintiff had just visited several months prior.

26. Plaintiff was deeply personally impacted by Israel's war on Gaza, as her family suffered constant bombardment, starvation, forced displacement, and destruction.

27. Plaintiff publicly advocated widely against Israel's war on Gaza, including but not limited to on broadcast television, radio, newspaper, print, and online media.

28. Additionally, within just months of the start of the war, Plaintiff's cousins, who lived in Gaza and with whom she was very close and grew up with, were taken hostage by Israel, which led Plaintiff to intensify her public advocacy against Israel's war on Gaza.

29. Defendant had knowledge of Plaintiff's identity as a Middle Eastern, Palestinian, Muslim woman from Gaza who wears a hijab, and had knowledge of her public advocacy against Israel's war on Gaza.

30. In or around October 2023, after the start of the Israel-Gaza war and against a university-wide policy not to express political opinions, Defendant's president Michael Schill circulated numerous university-wide e-mails expressing mourning and support for Israel and establishing an Anti-Semitism committee.

31. Defendant did not circulate any correspondence regarding Gaza and/or Palestine, and did not establish a committee related to Gazans, Palestinians, and/or Muslims, despite the detrimental impact of the Israel-Gaza war on these protected classes, which Plaintiff is a member of.

32. Plaintiff was deeply emotionally impacted by Defendant's staunch stance in support of Israel and in opposition to Palestinians, in violation of its own policies.

33. Defendant did not violate its policies to take a public stance on any other social issue or in opposition to or support of any other ethnic, racial, or religious group.

34. On or about October 10, 2023, Plaintiff observed threatening and violent conduct by one of Defendant's student, who, in relevant part and amongst other posts, posted on his Instagram profile: "wipe out the disgrace" in reference to Palestinians; "[O]ur enemies don't deserve a quick death. Gracing them with our bombs is an act of mercy" in reference to Palestinians; "Amen Amen" to a post stating "Gaza will turn into a tent city. No buildings will remain"; and threats to supporters of Palestine to "let me know so we can share your address online."

35. Plaintiff promptly reported to Defendant this student's conduct and violation of Defendant's student handbook and policies, and explicitly stated her fear for her safety as a Palestinian student on campus.

36. Defendant failed to take any corrective action or any action otherwise in response to Plaintiff's report.

37. Upon information and belief, Defendant took no corrective action against this student.

38. Upon information and belief, after Plaintiff reported this student's social media violations of Defendant's student handbook and policies, the same student continued on to state, while on Defendant's campus, that "all Palestinians should be killed."

39. Plaintiff promptly reported this comment to Defendant, expressing safety concerns.

40. Defendant failed to take any corrective action or any action otherwise in response to Plaintiff's report.

41. Upon information and belief, Defendant took no corrective action against the student.

42. In fact, the same student went on to apply to Defendant's joint JD-MBA program, which Defendant accepted him into.

43. A professor of mediation who Plaintiff trusted suggested a mediated session between Plaintiff and this student, which Plaintiff accepted.

44. Plaintiff requested the mediated session with this student numerous times from Dean Susan Spies Roth,  who provided empty assurances it would happen before ultimately ignoring Plaintiff's requests entirely.

45. Plaintiff did not receive the mediated session that was promised with this student in order to ensure that she felt safe and comfortable as a Palestinian on Defendant's campus.

46. On or about October 11, 2023, Plaintiff's professor, Professor Martin Redish, stated in the classroom where Plaintiff was seated that he was "impressed" by how swiftly law firm Winston & Strawn terminated an NYU law student for her comments in support of Palestine.

47. Further, Professor Redish expressed support for the doxing of Harvard students who expressed support for Palestine.

48. Other, similarly-situated individuals outside of Plaintiff's protected classes were not subject to the same or similar conduct as Plaintiff, including harmful comments about their national origin by professors.

49. Plaintiff promptly reported Professor Redish's discriminatory comments to Defendant.

50. Defendant failed to take any corrective action in response to Plaintiff's report.

51. On or about November 16, 2023, Plaintiff, in conjunction with other law students, including two other Palestinian students, organized a peaceful, silent protest in support of Palestine, wherein protestors taped their mouths shut, wore all black, and carried signs including statistics about the humanitarian tragedies suffered in Gaza as they silently marched through Defendant's halls.

52. Plaintiff explicitly enforced a policy of no photography or videography in order to protect students' identities and to prevent doxing by counter-protestors.

53. Despite Plaintiff's explicit policy prohibiting photography and videography, and despite protestors' explicit refusal to be photographed, several of Defendant's law students photographed and recorded videos of Plaintiff and other protestors without their consent, even when asked to stop, stalking the protestors around the school and disrupting the peaceful protest.

54. At one point during the peaceful protest, while Plaintiff and protestors stood in Harry's Cafe on Defendant's campus, individuals in the cafe heckled Plaintiff and her fellow protestors with threatening comments, including but not limited to, "We know people high up in the university," and "Good luck getting a job after this."

55. While in the cafe, Defendant's law student Melody Mostow intimidated two Palestinian law students, who both expressed they were uncomfortable and required assistance.

56. Plaintiff stepped in to protect her fellow Palestinian law students, and politely and calmly requested that Mostow give the two students their requested space.

57. Mostow refused.

58. A fellow protestor brought Dean George M. Langford in from a nearby hall to separate Mostow from the two Palestinian law students.

59. Dean Langford did nothing to stop the nonconsensual photography and videography of protestors, including Plaintiff.

60. When Mostow separated from the two Palestinian law students, Plaintiff and Mostow walked away from one another, inadvertently and lightly brushing shoulders.

61. Immediately upon the accidental physical contact between Mostow and Plaintiff, Plaintiff put both hands up, stepped away from Mostow, and explicitly expressed that the light shoulder brush that occurred between them was not intentional on her part by any means.

62. Mostow explicitly acknowledged that she understood that the shoulder brush between them was not intentional.

63. Upon the conclusion of the silent protest, Plaintiff, along with the two Palestinian law students and other participating students, requested to meet, and did meet, with Dean Hari

M. Osofsky, Dean Susan Spies Roth, and Dean George M. Langford (collectively "the Deans").

64. During the meeting with the Deans, Plaintiff reported a host of concerns to the Deans, including but not limited to the comments of "Good luck getting a job after this" and "We know people high up in the university," and that protestors had been photographed and videographed without their consent on Defendant's property during an organized student event, which created a foreseeable risk of doxing, stalking, and reputational harm.

65. Additionally, Plaintiff reported to the Deans that her and Mostow's shoulders lightly brushed against one another inadvertently, and that she had put her hands up, stepped away from Mostow, expressed the unintentional nature of the brushing to Mostow, and received acknowledgement from Mostow of the same.

66. Plaintiff expressed to the Deans her worry and fear that Mostow would inflate and mischaracterize the inadvertent light brushing, and expressed her worry and fear that her job offer at law firm DLA Piper as an associate in the Fall 2024 class, which Plaintiff had accepted in August 2023, would be compromised as a result.

67. Dean Osofsky waved Plaintiff's worry away by assuring Plaintiff they would deal with this possibility when the time came.

68. In response, Plaintiff expressed that at that point, her job will have already been compromised, and she required Defendant's proactive protection in order to avoid losing her job.

69. Defendant failed to take any corrective action or any action otherwise in response to Plaintiff's report and concerns.

70. As Plaintiff anticipated, Mostow and Kinney worked in concert to inflate and mischaracterize the inadvertent light shoulder brushing.

71. On or about the same day as the silent protest, Mostow falsely reported to the Northwestern University Police Department ("NUPD") that Plaintiff assaulted, battered, stalked, and harassed her at the peaceful, silent protest.

72. Defendant admitted that its own video footage of Plaintiff's interactions with Mostow did not reveal any such physical contact with Plaintiff.

73. NUPD did not contact Plaintiff about Mostow's false report.

74. Despite not contacting Plaintiff about Mostow's false report, NUPD posted Mostow's allegations on their website.

75. NUPD failed to remove Mostow's false claim from their public database, causing harm to Plaintiff's reputation and perpetuating the false accusation that Plaintiff committed a crime.

76. A student of Defendant outside of Plaintiff's protected classes recorded a video of Plaintiff while Plaintiff participated in the peaceful, silent protest on Defendant's premises against Plaintiff's consent, in violation of Defendant's student policies and handbook.

77. Kinney subsequently publicly published the nonconsensual video of Plaintiff and the nonconsensual video of the two other Palestinian students on the social media platform, X, in violation of Defendant's student policies and handbook.

78. Further, Kinney also publicly published Plaintiff's private university-related financial aid information without Plaintiff's consent on the social media platform, X, in violation of Defendant's student handbook and policies.

79. Around this same time, Plaintiff discovered that her private university e-mail address was leaked to external, non-university related entities in violation of Defendant's student policies and handbook, causing her to directly receive a barrage of unwanted and harmful anti-Palestinian correspondence.

80. Plaintiff promptly reported to Defendant the leaking of her private university e-mail address, the recording of a video of her against her consent on Defendant's premises, the nonconsensual and public publication of a video taken of her without her consent, and the nonconsensual and public publication of her private university-related financial aid information, all of which violated Defendant's student policies and handbook.

81. Effectively, 100% of Plaintiff's Palestinian students, and no other students, were doxed online as a result of nonconsensual recording on Defendant's premises, including Plaintiff.

82. Defendant had knowledge of the nonconsensual recordings that occurred on its premises against its Palestinian students, as all the Palestinian students, including Plaintiff, reported the nonconsensual recording immediately to Plaintiff, and reported the social media posts to Defendant.

83. Defendant failed to take any corrective action or otherwise take any action in response to these reports, including Plaintiff's, and in response to the student handbook and policies violations.

84. Defendant failed to take action to protect Plaintiff against the conduct that violated its own student policies and handbook, and failed to take action against the students who engaged in the violative, hostile, and harassing conduct.

85. In addition to reporting to Defendant her fears for her job the same day her employment was first threatened by members of Defendant's community, Plaintiff continued to escalate her concerns for her job throughout the year and even after graduation.

86. In relation to the peaceful silent protest, on or about May 20, 2024, Tony Kinnett ("Kinnett"), an investigative columnist with the Daily Signal, emailed Plaintiff stating that she "is alleged to have followed/stalked and then assaulted an individual on November 9, 2023" and asked her "Did you follow/stalk Melody Mostow on 11/9/23? Did you assault Melody Mostow on 11/9/23?"

87. On or about that same day, Plaintiff forwarded Kinnett's email to the Deans with the notice that "Now, I am at risk of being defamed with false allegations from Melody Mostow. I can consider my job offer rescinded if this publishes. I need the administration's assistance in immediately shutting this down. The administration must contact the reporter and emphasize that this event is fully fabricated, false, and defamatory."

88. Rather than protect their student, Dean Spies Roth told Plaintiff to refer the reporter to "media@northwestern.edu," and took no further action.

89. Defendant knew the information requested from the reporter to be false, and still failed to take any correction action, or any substantive action otherwise against information they knew to be false.

90. On or about May 21, 2024, Kinnett published an article stating that, "Mostow alleged that Elagha pushed her in the back. She filed a report with Northwestern University Police about the incident involving Elagha."

91. Kinnett's article was published widely by several news outlets and spread on social media.

92. Defendant knew this allegation to be false and knowingly failed to take any corrective action or any action otherwise.

93. Plaintiff, who was studying for the July 2024 bar exam, faced severe emotional distress, including heightened anxiety and deep depression, from the allegations in the article and the prospective damage to her career that she feared.

94. In or around June 2024, Plaintiff received correspondence from the Illinois Board of Admissions to the Bar ("IBAB"), which stated that IBAB received communication that Plaintiff had a criminal charge that she failed to report (the false allegation by Mostow), which compromised her ability to successfully pass the Character and Fitness assessment required for licensure as an attorney.

95. Instead of focusing her efforts on studying for the bar exam, Plaintiff spent her time attempting to successfully pass her Character and Fitness assessment by combating Mostow's false allegations, which were peddled and advertised by Kinnett and other news agencies.

96. In or around mid-July 2024, Plaintiff received an email from DLA Piper rescinding her job offer to join as an associate in the incoming Fall 2024 class.

97. Upon receipt of this correspondence, Plaintiff broke down and immediately reported to Defendant that the fear she had vocalized for almost one full year further to conduct by Defendant and its students had come to fruition.

98. Upon information and belief, neither Star Media, Daily Signal, Connecticut Star, Tennessee Star, nor Kinnett, all of which published ever reached out to the Defendant Northwestern to corroborate the allegations.

99. Northwestern's failure to act after acquiring actual knowledge that the allegations were false left Plaintiff liable or vulnerable to continuing harassment and retaliation, especially given that the false accusation had already been placed into channels that predictably migrate into external scrutiny, including employment vetting and professional licensing.

100. Other, similarly-situated individuals outside of Plaintiff's protected classes were not subject to the same or similar conduct respective to Defendant addressing violations of Defendant's student policies and handbook, including being recorded against their consent on Defendant's premises, having private university e-mail addresses leaked, having nonconsensual recordings of them publicly published, and having their private university-related financial aid information publicly published without their consent.

101. Upon information and belief, Defendant took prompt action in protection of students outside of Plaintiff's protected classes who suffered from violations of Defendant's student policies and handbook.

102. On or about October 25, 2023, Defendant's Jewish Law Student Association (JLSA) publicly advertised and hosted a highly-attended vigil in support of Israel in a public lobby on Defendant's campus, which, upon information and belief, members of Defendant's administration openly attended.

103. On or about the same time, Plaintiff, in conjunction and association with Defendant's Muslim Law Student Association (MLSA), hosted a vigil in support of Palestine, which members of Defendant's administration coerced should be small, private, not publicly

advertised, and not in a public area on Defendant's campus, which resulted in low attendance.

104.    Upon information and belief, the JLSA did not receive the same advisement or coercion by Defendant.

105.    On or about November 3, 2021, just three days after a tragic off-campus incident impacting Black students of Defendant (students outside of Plaintiff's protected classes), Defendant promptly granted the Black Law Student Association (BLSA) a grieving space in a public, accessible room with a capacity of at least 25 individuals in one of Defendant's most in-demand halls on the main floor of Defendant's campus, which Defendant reserved for Black students through the remainder of the Fall 2021 semester into December 2021.

106.    In or around mid-October 2023, Plaintiff and other students in Plaintiff's protected classes requested a grieving space on Defendant's campus in relation to the tragic events in Gaza and Palestine that directly impacted Plaintiff.

107.    Defendant failed entirely to secure such a grieving space for weeks until approximately one week before final exams and the end of the Fall 2023 semester, at which time Defendant reserved a small room in a remote, non-accessible location on a distant level of Defendant's campus that impacted students expressed they felt unsafe accessing.

108.    On or about October 9, 2023, the JLSA publicly published a statement that included a document that students, faculty, and staff of Defendant signed publicly in support of Israel.

109.    Around the same time, Plaintiff made efforts to gain support for a statement recognizing the humanitarian tragedies suffered by Palestinians, but was shuttered by every one of Defendant's student organizations, some of which expressed fears of being targeted for expressing views sympathetic to the suffering in Gaza, which Plaintiff reported to Defendant.

110.    Defendant made no efforts to engage or otherwise respond to Plaintiff's report.

111.    Similarly, Defendant's faculty publicly published a letter in support of Israel and condemning Palestinians, which a professor of Defendant prominently posted on the door of his office on Defendant's campus.

112.    Other faculty of Defendant attempted to provide feedback to soften the polarizing language in the faculty letter in support of Israel, and were bullied, intimidated, and threatened with their jobs in response, which Plaintiff reported to Defendant.

113.    Defendant failed to take any corrective action or any action otherwise in response to Plaintiff's report.

114.    Other faculty attempted to publish a letter related to Palestine, and were bullied, intimidated, and threatened with their jobs in response, which Plaintiff reported to Defendant.

115.    Defendant did not take any corrective action or any action otherwise in response to Plaintiff's report.

116.    On or about November 7, 2023, Plaintiff, in conjunction with other students, organized a Palestine-related event on Defendant's campus, and publicly posted posters advertising the event to Defendant's bulletin board, where other event posters were regularly posted.

117.    Defendant immediately removed the posters advertising Plaintiff's event, pretextually citing that the posters did not comply with Defendant's poster policy.

118.    After removing the posters advertising Plaintiff's event, Defendant immediately circulated an e-mail strictly and discriminately enforcing its poster policy against Plaintiff's event posters.

119.    Upon receipt of Defendant's e-mail, students organizing Plaintiff's event sent Defendant an e-mail citing at least 43 instances of non-compliant posters advertising events unrelated to Plaintiff's protected classes, and emphasizing to Defendant that Defendant did not remove any of the other non-compliant posters.

120.    Defendant failed to remove any posters it learned were non-compliant with the policy it discriminately enforced against Plaintiff's event.

121.    Other events not related to Plaintiff's protected classes did not face strict enforcement of Defendant's poster policy.

122.    Plaintiff reported the discriminate enforcement of the poster policy to Defendant.

123.    Defendant did not take any corrective action or any action otherwise in response to Plaintiff's report.

124.    On or about November 20, 2023, Plaintiff hosted a "Palestine Teach-In" featuring a prominent speaker  from the Human Rights Watch, who informed students of the humanitarian tragedies and crimes faced in Palestine and conducted a "Know Your Rights" legal information session.

125.    Despite consistent communication by Plaintiff and other involved students with Defendant about the risks to student safety surrounding the event, Defendant failed to take any measures to create a safe space to host the event.

126.    Defendant failed entirely to take any action in response to Plaintiff's expressed concerns for her and other students' safety.

127.    As a result of Defendant's complete failures to ensure student safety and in response to security risks by opposing students that Plaintiff learned of and reported to Defendant related to the "Palestine Teach-In," Plaintiff had no choice but to host the event in a remote, inaccessible space with all entries locked; enforce a strict RSVP-only policy, which was enforced indiscriminately even against students who expressed genuine interest in the event and support for Palestine; shut down the RSVP link early; source faculty members to man the doors and check RSVPs to minimize unsafe student interactions; pack the event space with faculty members for student protection; enforce a policy of no photos, videos, or recordings of the event; coach attendees before the start of the event not to engage any opposition; and provide face masks for attendees to wear to protect their identities, among other protective measures.

128.    Plaintiff expressed these and other safety concerns to Defendant before and during the event.

129.    Defendant failed to take any action to ensure event or student safety, any corrective action after learning of the security risks posed to Plaintiff's event, or otherwise address any of Plaintiff's concerns.

130.    By contrast, on or about April 4, 2024, the JLSA openly hosted an event in support of Israel in a public, accessible space on the main floor of Defendant's campus featuring Professor Bernie Black, who stated, in relevant part, "Palestinian children at the age of 12 are already ready to kill"; "Palestinians don't want peace"; "Peace will come when the Palestinians love their children more than they hate the Jews"; "Maybe this time they can

create a mini Singapore instead of a mini ISIS" in reference to the destruction of Gaza, amongst other similarly discriminatory comments.

131. Upon information and belief, the JLSA did not face safety concerns and did not take any of the safety measures Plaintiff had no choice but to take when hosting the "Palestine Teach-In."

132. Several of Defendant's students reported Professor Black's comments to Defendant.

133. Defendant failed to take any corrective action or any action otherwise in response to these numerous reports.

134. Instead of addressing the hostile learning environment Plaintiff outlined to them throughout the semester through countless written complaints, multiple OCR reports, and numerous meetings with the Deans, Defendant failed to take any corrective measures and instead advised Plaintiff to just not attend classes, which furthered Plaintiff from access to learning and an education.

135. Because Plaintiff did not have safe access to the classroom and thus did not attend many of her classes, Plaintiff had no way of being adequately prepared to take her final exams at the end of the Fall 2023 semester.

136. Instead of ensuring a safe learning environment or offering Plaintiff additional resources to assist her in learning the material, Plaintiff's final exams were pushed to the Spring 2024 semester, during which time (April 2024) Plaintiff taught herself one year's worth of courses and finally took her final exams over a 2-week span shortly before her graduation, with no support from the university to provide any additional resources, assistance, support, or guidance.

137.    As a direct consequence of the hostile environment and Northwestern's refusal to provide protective or remote accommodations, Plaintiff lost the ordinary educational benefits of the semester: regular classroom instruction, real-time engagement with faculty, and a stable exam schedule and was required to compress an entire academic year's worth of learning into a short period shortly before graduation, under severe stress and insecurity.

138.    On or about February 4, 2024, Plaintiff participated in Defendant's Global Village event, where students hosted cultural displays featuring their specific race, national origin, and/or ethnic background.

139.    Plaintiff hosted a cultural display of her Palestinian heritage, including but not limited to Palestinian food, clothing, plants, and dishware.

140.    Defendant posted a photo of Plaintiff's cultural display on its Instagram profile, along with photos of other cultural displays.

141.    That same day, the JLSA rebuked Defendant's post of Plaintiff's cultural display as "promoting propaganda," despite Plaintiff's display featuring only cultural, non-political elements of her national origin.

142.    In response, Defendant immediately deleted its post of Plaintiff's cultural display from its Instagram profile.

143.    Defendant did not delete any other posts of cultural displays from its Instagram profile.

144.    In or around January 2024, Plaintiff began her final semester as a law student at Defendant as a full-time intensive clinic student under the supervision of Professor

Bridget Arimond in her Palestine clinic project as part of Defendant's Center for International Human Rights.

145.  At or around the start of the semester, Plaintiff and Professor Arimond agreed on clinic expectations, which included no required in-person attendance, no billing requirement of 1/6th of an hour, and a general accounting of work completed, which Professor Arimond expressed was in line with her expectation for all her clinic students.

146.  Plaintiff and Professor Arimond also agreed that a majority of Plaintiff's work would be dedicated to the Palestine clinic project, which would be Plaintiff's priority.

147.  Throughout Plaintiff's time working with Professor Arimond, and among other instances, Professor Arimond buried Plaintiff in work unrelated to the Palestine project, provided Plaintiff with inconsistent instructions, harshly criticized Plaintiff's work product even when it followed her own instruction, dubbed the Palestine clinic the "problem team," likened forced displacement in Gaza - where Plaintiff's family lived - to "a two-week vacation," and told Plaintiff - in response to Plaintiff indicating she would enlarge an item on a screen - that, "someone who looks like you probably shouldn't go around saying you're going to blow things up" in reference to Plaintiff's Palestinian, Middle Eastern, Muslim background.

148.  Upon discovery of the nature of the work Professor Arimond buried Plaintiff in, the director of Defendant's Center for International Human Rights described it as "insanity," a "waste of time," and "antithetical to the work" that was aimed to be achieved.

149.  In or around February 2024, Plaintiff met with Professor Arimond, who informed Plaintiff that "this semester is not working out," alleged it was "impossible" for her to complete the semester, and berated Plaintiff's work performance in direct comparison to

two white, non-Arab, non-Middle Eastern, non-Muslim students outside of Plaintiff's protected classes.

150.    In this same meeting, Professor Arimond imposed heightened requirements on Plaintiff that contradicted her agreement with Plaintiff at the start of the semester and imposed a heightened requirement on Plaintiff that other, similarly-situated full-time intensive clinic students outside of Plaintiff's protected classes were not subject to, including imposing an in-person attendance requirement, requiring Plaintiff to bill 40 hours per week using increments of 1/6th of an hour, and maintaining an in-depth, detailed accounting of all work completed.

151.    Additionally, Professor Arimond pressured Plaintiff to delay her graduation and complete the semester during the summer 2024 term, which compromised a job offer Plaintiff had already accepted.

152.    Plaintiff reported Professor Arimond's conduct to Defendant, expressing her fear of losing her job offer due to Professor Arimond's interference with her graduation and expressed expectation that Plaintiff would not complete the spring 2024 term and graduate as expected.

153.    Defendant did not take any corrective action or any action otherwise in response to Plaintiff's report.

154.    In or around February 2024, Plaintiff took an approved one-week leave of absence from classes to attend to a family-related emergency, during which time Professor Arimond berated Plaintiff's work performance to students who did not work with Plaintiff; publicly disclosed Plaintiff's private and protected reason for taking a leave of

absence; alleged she was looking for Plaintiff's replacement; and refused Plaintiff previously agreed-upon access to critical meetings and class sessions.

155.    Plaintiff reported Professor Arimond's conduct against her to Defendant.

156.    Defendant did not take any corrective action or action in response to Plaintiff's report.

157.    Upon information and belief, Defendant took corrective action and/or action to protect students outside of Plaintiff's protected classes after receiving reports of professors' conduct against students.

158.    Other, similarly-situated clinic students outside of Plaintiff's protected classes were not subject to the same or similar treatment undertaken by Professor Arimond against Plaintiff.

159.    Other, similarly-situated students outside of Plaintiff's protected classes were not subject to the same or similar treatment by Defendant against Plaintiff.

160.    These incidents collectively contributed to a hostile environment and displayed deliberate indifference by Defendant against Plaintiff.

## DAMAGES

161.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of Defendant caused Plaintiff Elagha to be improperly publicly humiliated, harassed, attacked, wrongfully accused, terminated from her lucrative job, discriminated against, targeted, and discriminated against for criminal allegations for which she clearly did not commit.

162.    As a direct result of Defendants' actions and omissions, Plaintiff Elagha sustained injuries and damages, including but not limited to loss of her reputation, loss of her career opportunity at DLA Piper and similarly situated firms, income, pain and suffering, mental

anguish, emotional distress, indignities, degradation, restrictions on all forms of personal freedom including but not limited to diet, sleep, enjoyment, and freedom of speech and expression.

163.    As a direct result of Defendant's actions and omissions, Plaintiff Elagha sustained economic injuries and damages including loss of income and loss of career opportunities directly due to the widely disseminated false and defamatory criminal allegations published against her.

164.    As a direct result of Defendant's actions and omissions, Plaintiff Elagha sustained injuries and damages, including pain and suffering, personal injuries, public humiliation and degradation, loss of reputation, abuse, and harassment.

## **CAUSES OF ACTION**

### **COUNT I:**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.**
**Intentional Discrimination Towards Plaintiff and other Palestinian and/or Muslim Middle Eastern Students**

165.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

166.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

167.    Defendant Northwestern University receives substantial federal financial assistance from the United States Department of Education and other federal agencies, and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

168.     Plaintiff Elagha is and identifies as a Palestinian Muslim. Her actual and perceived ancestry, ethnicity, race, and national origin place her squarely within the class of individuals protected by Title VI.

169.     Members of the Middle Eastern Law Student Association likewise include Middle Eastern and Muslim students at Northwestern who are protected by Title VI.

170.     Discrimination against Middle Eastern and Muslim individuals based on actual or perceived ancestry, ethnic characteristics, or national origin is prohibited under Title VI, as reflected in longstanding Title VI jurisprudence and the written policies of the U.S. Department of Education's Office for Civil Rights.

171.     To state a claim for intentional discrimination under Title VI, § 1981, and the Equal Protection Clause, a plaintiff must plausibly allege that she was subjected to differential treatment because of her race, ethnicity, or national origin.

172.     Discrimination against Middle Easterners and/or Muslims based on actual or perceived ancestry, race, ethnic characteristics, or national origin – is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

173.     Intentional discrimination may be established through deliberate indifference where a federally funded institution has actual notice of severe, pervasive, and objectively offensive discrimination within its control and responds in a manner that is clearly unreasonable in light of known circumstances.

174.     The acts and omissions of Defendant Northwestern and its administrators, including but not limited to Hari Osofsky, Susan Michelle Spies Roth, and George Langford subjected Plaintiff Elagha to discrimination, harassment, and targeting on the basis of her

actual and perceived Palestinian Muslim ancestry, race, ethnic characteristics, and national origin.

175.   Defendant Northwestern and its administrators, including but not limited to Hari Osofsky, Susan Michelle Spies Roth, and George Langford, had actual notice that such discrimination and harassment, over which Northwestern has substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on Middle Eastern and/or Muslim ancestry, race, ethnic characteristics, or national origin that deprives Plaintiff Elagha full access to Defendant Northwestern's protections, opportunities, and educational programs.

176.   For over three years, Plaintiff repeatedly reported severe, pervasive, and objectively offensive conduct directed at her and similarly situated Palestinian and Muslim students by fellow students and faculty. Plaintiff met with Defendant Northwestern administrators on numerous occasions, raised threats to her safety in writing and in person, expressed repeated concerns for her wellbeing, filed Office for Civil Rights complaints, and requested no-contact directives.

177.   Defendant Northwestern and its administrators had actual knowledge that Palestinian and Muslim students were being photographed, identified, surveilled, and doxed during protests; were repeatedly warned that this conduct exposed those students to heightened risks of retaliation, reputational harm, and professional consequences; and nonetheless failed to act.

178.   Defendant Northwestern exercised substantial control over both the harassers and the context in which the harassment occurred, possessed the authority and means to

intervene, and yet declined to enforce its own policies or implement readily available protective or disciplinary measures.

179.    Despite actual notice, Defendant Northwestern and its administrators clearly and unreasonably failed, and continue to fail, to meaningfully address the discrimination, harassment, and hostile environment endured by Plaintiff and similarly situated students.

180.    Northwestern failed to discipline student Mostow and others who targeted Plaintiff, made false accusations against her, and violated university policies; failed to address discriminatory and hostile statements by faculty; and failed to remediate the hostile educational environment faced by Palestinian and Muslim students.

181.    Northwestern's inaction communicated to harassing students that Palestinian and Muslim students could be targeted without consequence, emboldening misconduct and escalating harassment from filming and threats to doxing, false accusations, and reputational attacks.

182.    Northwestern engaged in a consistent pattern of affording institutional protection, access, and accommodation to non-Palestinian and non-Muslim students while denying Plaintiff comparable protections under materially similar circumstances.

183.    Northwestern granted no-contact directives, access to public space, administrative support, and event accommodations to students outside Plaintiff's protected classes, yet repeatedly denied Plaintiff those same protections despite documented threats, safety concerns, and policy violations.

184.    The sole "accommodation" Northwestern claims to have offered—excusing Plaintiff from class rather than providing remote learning or protective measures—functionally

excluded Plaintiff from the educational environment while allowing the discriminatory conditions and harassment to persist.

185.    Plaintiff was forced to choose between her personal safety and access to coursework, faculty, classroom participation, and professional opportunities.

186.    As a direct consequence of Northwestern's deliberate indifference and discriminatory conduct, Plaintiff lost the ordinary educational benefits of the semester, including regular classroom instruction, real-time faculty engagement, and a stable exam schedule.

187.    Plaintiff was required to compress an entire academic year's worth of learning into a short period immediately preceding graduation, under conditions of severe stress, insecurity, and fear.

188.    Northwestern's refusal to protect Plaintiff from foreseeable doxing, failure to discipline students who made false allegations, and refusal to prevent or correct publication of those allegations was clearly unreasonable and directly caused Plaintiff to lose a job she had worked diligently to secure.

189.    Defendant Northwestern and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff Elagha and similar situated students, address the discriminatory and hostile statements made by faculty, discipline Mostow and other students who targeted and made false claims against Plaintiff Elagha in violation of the school policies, and the hostile environment that she and other Middle Eastern and Muslim students are forced to endure at Defendant Northwestern because of their race, ethnic characteristics, or national origin.

190. Defendant Northwestern's lack of action or insufficient action to numerous instances of severe, pervasive, and objectively offensive conduct experienced by Plaintiff and similarly situated students was clearly unreasonable and caused Plaintiff and similarly-situated students to be made vulnerable to and undergo harassment. Defendant Northwestern's refusal to protect plaintiff from foreseeable doxxing, discipline Mostow for false allegations, or take action to neither prevent nor correct any publication of said false allegations, was clearly unreasonable and deprived Plaintiff of a job she had worked hard for.

191. Northwestern's discriminatory intent is further evidenced by its selective institutional messaging. Despite a policy prohibiting political advocacy, senior administrators issued university-wide statements mourning Israeli victims while omitting any acknowledgment of Palestinian civilian harm, during a period of escalating harassment against Palestinian and Muslim students. This selective signaling conveyed institutional alignment and emboldened discriminatory conduct.

192. Northwestern's actual notice of the hostile educational environment, combined with its failure to take effective remedial action, constitutes deliberate indifference under Title VI. See *Ha v. Nw. Univ.*, No. 14 C 895, 2014 U.S. Dist. LEXIS 160046, at *1 (N.D. Ill. Nov. 13, 2014).

193. Northwestern engaged in a consistent pattern of affording institutional protection, access, and accommodation to students outside Plaintiff's protected classes while denying Plaintiff comparable protections under materially similar circumstances. Northwestern granted no-contact directives, public space, administrative support, and event access to non-Palestinian and non-Muslim students, yet repeatedly denied Plaintiff

those same protections despite documented threats, safety concerns, and policy violations.

194. Defendant Northwestern and its administrators intentionally discriminated against Plaintiff and other similarly situated students on the basis of their actual and perceived Palestinian Muslim ancestry, ethnicity, race, and national origin, in violation of Title VI.

195. Defendant Northwestern's violations of Title VI are the actual, direct, and proximate causes of Plaintiff Elagha's injuries.

196. As a result of the foregoing, Plaintiff Elagha has suffered, and continue to suffer, substantial damages, in amounts to be determined at trial.

197. Plaintiff is entitled to attorneys' fees and costs pursuant to Title VI of the Civil Rights Act of 1964.

**WHEREFORE**, Plaintiff prays this Honorable Court enter a judgment against all Defendants for actual and punitive damages sufficient to compensate for the damages caused by Defendants' violation of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §2000d *et seq*, and to deter Defendants and others from similar behavior in the future. Plaintiff further prays that this Honorable Court awards her attorneys' fees and costs pursuant to Title VI of the Civil Rights Act of 1964.

**Count II:**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.**
**Hostile Educational Environment**

198. Plaintiff incorporates by reference all of the foregoing paragraphs.

199. Additionally, Defendant Northwestern continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate

indifference caused Plaintiff Elagha to be subjected to a hostile educational environment and ultimately cost Plaintiff Elagha her lucrative job.

200. From October 2023 through Spring 2024, Plaintiff was subjected to escalating harassment, including genocidal threats, nonconsensual filming, public dissemination of private information, knowingly false criminal allegations, and racially charged faculty conduct. These incidents were continuous and sufficiently severe and pervasive to interfere with Plaintiff's access to Northwestern's educational programs.

201. The environment at Defendant Northwestern, which has been rendered hostile for Plaintiff Elagha as a result of her Palestinian and Muslim ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprived Plaintiff Elagha of equal access protection under school policies, and deprived Plaintiff Elagha of the educational opportunities and benefits that Defendant Northwestern provides to non-Middle Eastern and non-Muslim students.

202. Defendant Northwestern and its administrators, including but not limited to Defendants Hari Osofsky, Susan Michelle Spies Roth, and George Langford, actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

203. Defendant Northwestern and its administrators, including but not limited to Defendants Hari Osofsky, Susan Michelle Spies Roth, and George Langford, also directly and intentionally discriminated against Plaintiff Elagha, with her actual or perceived Palestinian and Muslim ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Defendant Northwestern's actions.

204. Defendant Northwestern continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference,

and/or unjustifiable delay, in applying its policies to known or reported incidents involving false claims and false criminal accusations, harassment, or where the victim or complainant is a Middle Eastern or Muslim Student, including Plaintiff Elagha. As detailed above, Defendant Northwestern's actions, inactions, and conduct were, and continue to be, intended to treat Plaintiff Elagha differently as a Palestinian Muslim student as compared to other similarly situated non-Middle Eastern or non-Muslim students.

205.    Defendant Northwestern's actions and inactions failed to properly protect Plaintiff Elagha from harassment and false claims made by other students, failed to enforce policies designed to prevent false allegations and harassment, and failed to take any reasonable step to prevent a knowingly false statement and accusation from being published against Plaintiff.

206.    Because of the hostile, unsafe learning environment and the personal losses Plaintiff endured, Plaintiff could not attend her classes on campus.

207.    Defendant Northwestern did not grant Plaintiff a remote learning accommodation, and told Plaintiff that she could be excused from classes.

208.    Instead of addressing the hostile learning environment Plaintiff outlined to them throughout the semester, Defendant Northwestern opted to allow Plaintiff to just not attend classes, which furthered Plaintiff from access to learning and an education.

209.    Because Plaintiff did not have safe access to the classroom and thus did not attend many of my classes, Plaintiff did not feel adequately prepared to take her final exams at the end of the Fall 2023 semester.

210.    Rather, Plaintiff's final exams were pushed to the Spring 2024 semester, during which time (April 2024) Plaintiff taught herself one year's worth of courses and finally took her final exams over a 2-week span shortly before graduating in May 2024.

211.    In addition, Plaintiff was subject to racist remarks and treatment from Professor Arimond.

212.    On February 27, 2024, Plaintiff sent an email to Deans Osofsky and Spies Roth detailing Professor Arimond's discriminatory, and racist conduct toward the Plaintiff.

213.    In the February 27, 2024 email, Plaintiff advised Deans Osofsky and Spies Roth that Professor Arimond stated that "someone who looks like you probably shouldn't go around saying they're going to blow things up."

214.    Professor Arimond's racist statement was in response to Plaintiff indicating that she would blow something up on her computer screen-as in enlarge the object for easier viewing.

215.    Moreover, public statements made by various officials of the Defendant Northwestern, including its President, contributed to the hostile and unsafe environment on the law school campus.

216.    In October 2023 and November 2023, President Schill issued emails condemning Hamas with no mention of Israeli violence against Palestinians.

217.    Similarly, in October 2023, Dean Osofsky also issued an email condemning Hamas with no mention of Israeli violence against Palestinians.

218.    Despite the Defendant Northwestern's policy prohibiting administration officials from expressing political views, top administrative officials of Defendant Northwestern issued

public statements condemning Hamas with no mention of Israeli violence against Palestinians.

219.    Northwestern's discriminatory intent is evidenced by its selective refusal to deploy protective measures it routinely provides to other students. Plaintiff repeatedly requested a no-contact directive against a fellow student who openly threatened and targeted her, yet Northwestern denied Plaintiff that protection while granting no-contact directives to other students outside Plaintiff's protected classes for comparable conduct. This differential treatment was not accidental or discretionary—it reflected a deliberate choice to deny Plaintiff institutional protections afforded to others.

220.    Defendant Northwestern further acted with discriminatory intent by knowingly tolerating and perpetuating false allegations against Plaintiff after confirming their falsity. Northwestern's Office of Civil Rights reviewed video footage of the November 2023 protest and determined that Plaintiff did not engage in any physical contact and did not violate University policy. Northwestern was further informed that the accusing student recanted her allegations. Nevertheless, Northwestern failed to correct the public record that it maintained, failed to reasonably intervene with media outlets, and failed to take disciplinary or remedial action against those responsible for disseminating false claims, despite knowing that these allegations posed a serious and imminent risk to Plaintiff's career and professional licensure.

221.    After Plaintiff submitted multiple written complaints placing Northwestern on actual notice of discriminatory harassment and false allegations, University administrators repeatedly redirected Plaintiff to in-person meetings in lieu of providing written responses, formal determinations, or documented corrective action. These meetings

resulted in no enforceable outcomes, no memorialized findings, and no intervention, allowing the hostile environment to persist and escalate. Such a response was clearly unreasonable in light of the known and ongoing risks to Plaintiff's education and professional future.

222. Taken together, these incidents created and perpetuated a hostile educational environment that was severe, pervasive, and objectively offensive, and that unreasonably interfered with Plaintiff's ability to access and benefit from Northwestern's educational programs.

223. Defendant Northwestern clearly knew of the harassment and false criminal claims and accusations made by other students towards Plaintiff through repeated documentation.

224. Northwestern's response was clearly unreasonable. Despite repeated written complaints, video evidence, recanted accusations, and documented safety risks, Northwestern failed to issue findings, enforce protective measures, discipline violators, correct the public record, or provide meaningful accommodations, allowing the hostile environment to persist and intensify.

225. Defendant Northwestern failed to take any reasonable step to end the harassment, punish the harassment, and protect Plaintiff Elagha from the damages suffered as a result of the accusations against her after repeated warnings to Defendant Northwestern.

226. Defendant Northwestern's violations of Title VI are the actual, direct, and proximate causes of Plaintiff Elagha's injuries.

227. As a result of the foregoing, Plaintiff Elagha has suffered, and continues to suffer, substantial damages, in amounts to be determined at trial.

228.    Plaintiff is entitled to attorneys' fees and costs pursuant to Title VI of the Civil Rights Act of 1964.

**WHEREFORE**, Plaintiff prays this Honorable Court enter a judgment against all Defendants for actual and punitive damages sufficient to compensate for the damages caused by Defendants' violation of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §2000d *et seq*, and to deter Defendants and others from similar behavior in the future. Plaintiff further prays that this Honorable Court awards her attorneys' fees and costs pursuant to Title VI of the Civil Rights Act of 1964.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff YASMEEN ELAGHA prays as follows:

A.    That the Court award compensatory, consequential, liquidated, and punitive damages to Plaintiff against all Defendants, jointly and severally, in an amount to be determined at trial;

B.    Reasonable attorneys' fees, costs of suit, and expenses;

C.    Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

D.    For all other relief and damages to which Plaintiff may be entitled.

Dated: December 16, 2025                    Respectfully submitted,

By: */s/ Waleed Naser*
WALEED NASER
155 N. Wacker Dr. Suite 4250
Chicago, IL 60606
Office: 312-248-2501
Direct: 872-265-8490
waleed@naserlegal.com

FARAH CHALISA
155 N. Wacker Dr. Suite 4250

Chicago, IL 60606
Tel: 224-392-7822
farah@naserlegal.com

**ATTORNEYS FOR
YASMEEN ELAGHA**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

**YASMEEN ELAGHA**

              *Plaintiff*,

v.                                       **Case No: 1:24-cv-12066**
                                              **Hon. Charles P. Kocoras**
                                              **JURY TRIAL DEMANDED**

**NORTHWESTERN UNIVERSITY,**

              *Defendant.*

---

### DEMAND FOR JURY TRIAL

      **NOW COMES**, Plaintiff, Yasmeen Elagha, by and through her counsel Waleed Naser, and Farah Chalisa, and pursuant to Fed.R.Civ.P. 38, hereby demands a jury trial on all the issues so triable by a jury as pled in Plaintiff's third amended complaint.

Dated: December 16, 2025                    Respectfully submitted,

                                        By: */s/ Waleed Naser*
                                        WALEED NASER
                                        155 N. Wacker Dr. Suite 4250
                                        Chicago, IL 60606
                                        Office: 312-248-2501
                                        Direct: 872-265-8490
                                        waleed@naserlegal.com

**CERTIFICATE OF SERVICE**

I, WALEED NASER, certify that the foregoing document was filed and served via the Court's electronic filing system this 16th day of December, 2025, which will automatically send notification of such filing to all attorneys and parties of record registered electronically.

Dated: December 16, 2025                    Respectfully submitted,

By: */s/ Waleed Naser*
WALEED NASER
155 N. Wacker Dr. Suite 4250
Chicago, IL 60606
Office: 312-248-2501
Direct: 872-265-8490
waleed@naserlegal.com